***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives, the Full Commission affirms the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between the named employee and named-employer.
3. Key Risk Insurance Company was the carrier on the risk.
4. The employee's average weekly wage will be determined from an Industrial Commission Form 22 wage chart to be provided by the defendants with supporting wage information.
5. The employee sustained an injury on or about May 3, 2005, the nature and extent of which are to be determined by the Industrial Commission.
6. The injury, the nature and extent of which are to be determined by the Industrial Commission, arose out of and in the course of plaintiff's employment with defendant-employer and is compensable.
7. In addition, the parties stipulated into evidence the following:
 (a) Packet of documents which included Industrial Commission forms and discovery responses.
 (b) An indexed packet of medical records and reports.
8. The Pre-Trial Agreement dated August 9, 2006, which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was thirty-three years old at the time of the hearing before the Deputy Commissioner and a high school graduate with additional community college credits, *Page 3 
began working for defendant-employer on May 24, 2004 as a truck driver. Defendant-employer performed marine construction as well as reforestation and fertilization for Weyerhaeuser Company. As a truck driver, plaintiff hauled fertilizer and heavy equipment to the job sites. There were times when work was slow and he would also perform maintenance on the truck at the shop.
2. The truck plaintiff drove for defendant-employer was a tractor-trailer rig with a low boy as the trailer. He drove 200 to 300 miles a day and the majority of his time at work was spent driving the truck. When hauling equipment, plaintiff was required to secure it with chains and binders. The chains weighed approximately 15 pounds and the binders weighed between 5 and 8 pounds. When plaintiff was loading the equipment, the heavy equipment operator was usually present and would drive the equipment onto the trailer. Plaintiff did not have to load or unload fertilizer, which was what he hauled the majority of the time.
3. On May 3, 2005 plaintiff was involved in a motor vehicle accident while driving in the course of his employment. A car pulled out in front of him as he was traveling on Highway 264. He was unable to stop the truck before it struck the car. After the impact, plaintiff lost control of the truck, which ended up in a ditch facing in the opposite direction. He then climbed out of the truck, checked the people in the car and called 911 for them, and then called his employer to report the accident. When later questioned by the investigating officer and Toby Tetterton, his employer, who came out to the accident scene, plaintiff denied having been injured. Since the tire rod to one of the wheels had been bent in the accident, the truck was towed to the company's shop, where it was subsequently repaired.
4. Plaintiff returned to work and did not mention anything about having any problems from the accident until the following week. Mr. Tetterton sent him to Dr. Boyette's office at that *Page 4 
time. Although he was the doctor used by the company, Dr. Boyette had also treated plaintiff since he was born. When Dr. Boyette's partner, Dr. Kassamali, examined him on May 11, 2005, plaintiff complained of pain in his right ribs and side, which radiated to his back. The doctor's impression was that plaintiff had a chest wall contusion with sprain or strain of the chest. X-rays of his chest and back were ordered and plaintiff was given medication, but no work restrictions were specified. Plaintiff continued working. He next saw Dr. Boyette on May 19, 2005. On that occasion, plaintiff complained of chest, right arm, back and ankle pain, and advised that he was having difficulty climbing into his truck and sleeping at night. His complaints were somewhat inconsistent and were so general that Dr. Boyette could not identify focal points of injury. The doctor continued to treat plaintiff with medication.
5. Dr. Boyette last saw plaintiff for these symptoms on May 26, 2005. That day plaintiff reported having pain from the back of his right shoulder down his arm and in his low back. Dr. Boyette still could not identify a specific problem and advised plaintiff that he could continue working, in that it was the doctor's understanding that plaintiff's employer was not requiring him to perform any tasks which were too demanding.
6. Plaintiff did continue to work and did not receive further medical treatment until June 8, 2005 when he went to the emergency room with complaints of right shoulder pain. He told Dr. Nina Ward, the emergency room physician, about the truck accident, about developing soreness approximately five days later and about mowing the lawn the previous day. Although he tried to relate his shoulder symptoms to the truck accident, Dr. Ward did not believe that they were related since plaintiff had had no shoulder pain at the time of the accident. She ordered a shoulder x-ray, which was negative with no evidence of fracture or dislocation, so she diagnosed him with muscular pain and advised him to follow up with his family doctor. *Page 5 
7. At some time in June, 2005 plaintiff advised Mr. Tetterton that he was not satisfied with the treatment Dr. Boyette had given him. Consequently, Mr. Tetterton, who had paid Dr. Boyette's bills, agreed to send plaintiff to Dr. Miller, an orthopedic surgeon. Dr. Miller evaluated him on June 30, 2005. Plaintiff told Dr. Miller that he had developed right ankle, right rib, right shoulder, sternum and low back pain over the course of two days following the motor vehicle accident and that he was still experiencing pain in his shoulder, ankle and low back, although his ankle was getting better. X-rays of his ankle revealed a hairline non-displaced fracture. Shoulder x-rays were normal.
8. Dr. Miller was of the impression that plaintiff had rotator cuff irritation and bursitis of the shoulder, and he injected a steroid solution into the joint. He also believed that plaintiff might have had a non-displaced fracture of the sternum but that the sternum and ankle condition should heal with time and without intervention. He released plaintiff to continue full work duties but advised him to avoid heavy lifting and twisting for the next few months.
9. Plaintiff continued working until July 12, 2005. He performed his regular duties except that Mr. Tetterton had agreed to provide him with assistance in tying down loads. However, after July 12, 2005 plaintiff stopped reporting for work and did not call his employer to explain his absence. Mr. Tetterton concluded that he had decided to quit his job.
10. Dr. Miller's physician's assistant saw plaintiff in follow-up on August 5, 2005 and ordered an MRI of the right shoulder, but the testing was not performed by September 27 when plaintiff next saw Dr. Miller. On examination that day, he had good range of motion, no weakness and no deficit, but he informed the doctor that his shoulder hurt too bad to work as a truck driver. Dr. Miller ordered the MRI and, based upon the complaints, took plaintiff out of work for four to five weeks. *Page 6 
11. Plaintiff underwent the MRI and returned to Dr. Miller on October 25, 2005. On that occasion, the doctor interpreted the test as showing some tendinosis of the rotator cuff and an os acrominale, a congenital abnormality of the acromiom where it forms in two parts. Dr. Miller recommended surgery, and on November 21, 2005 he operated on plaintiff's right shoulder to remove the piece of bone, which was impinging on the rotator cuff. During the operation, Dr. Miller found scarring or thickening of the tissue in the area of the bone fragment. Consequently, he considered the option that plaintiff might have fractured the acromiom as opposed to having had a congenital condition.
12. Following the operation, plaintiff underwent physical therapy and his condition slowly improved. Dr. Miller released him to return to work at full duty on June 6, 2006 but recommended that he avoid lifting more than 25 pounds with his right arm and that he avoid lifting more than 15 pounds over shoulder height with that arm for the next three months. When Dr. Miller next saw him in September, plaintiff had not returned to work, which surprised the doctor who thought that he was capable of performing his former job with defendant-employer.
13. Plaintiff had still not returned to work as of the date of hearing and had made minimal effort to find employment. He claimed that he was still unable to drive a truck, but his allegations to that effect are not credible.
14. On May 3, 2005 plaintiff sustained an accident arising out of and in the course of his employment with defendant-employer. The fact that the truck plaintiff was driving struck another vehicle and jackknifed constituted an usual occurrence which interrupted his regular work routine. Although he did not report an injury associated with the accident until the following week and did not complain of right shoulder symptoms until two weeks afterwards, both Dr. Boyette and Dr. Miller were of the opinion that the motor vehicle accident was the likely cause of *Page 7 
his subsequent symptoms except of the ankle symptoms, which Dr. Miller could not relate to the accident. Although the circumstances were certainly suspicious, particularly in view of the other credibility issues, since all of the medical testimony was favorable, plaintiff met his burden of proving that the shoulder condition which required surgery and which caused him to become unable to work was a proximate result of the accident in question, which either caused the condition or materially aggravated a preexisting condition.
15. Defendant-employer accommodated plaintiff's request for assistance in tying down the loads he transported. Plaintiff was capable of performing his job with that modification until the date he had surgery. He stopped working after July 12, 2005 without justification. Dr. Miller took him out of work before the operation based upon his complaints, his statement that he was unable to do his job and the implication that he had to tie down loads without assistance, but those statements have not been found to be credible.
16. Due to the injury by accident, plaintiff was unable to work in any capacity from the date of his surgery on November 21, 2005 through June 6, 2006, when he was released to return to work by Dr. Miller. As of June 7, 2006, plaintiff was capable of performing his prior work duties for defendant-employer but no longer had a job because he had quit without justification eleven months earlier. He then made practically no effort to find alternative employment. He not only did not prove further loss of earning capacity after June 6, 2006, the evidence established that he was capable of earning his regular wages in his former job with defendant-employer as of that date and would have returned to work but for the fact that he had quit the previous year.
17. Plaintiff reached maximum medical improvement with respect to his injury by accident on June 6, 2006. However, Dr. Miller did not evaluate him for permanent partial *Page 8 
impairment so no finding is made regarding whether he sustained any permanent partial disability as a result of the injury by accident giving rise to this claim.
18. No Form 22 wage statement was presented; however, plaintiff stated on his Form 18 and defendants stated in their contentions that plaintiff's average weekly wage was $440.00 yielding a compensation rate of $293.33. The Full Commission finds as fact that plaintiff's average weekly wage was $440.00.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 3, 2005 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, which resulted in injuries to his right arm and shoulder, low back and right ribs. N.C. Gen. Stat. § 97-2 (6).
2. Despite the credibility issues, plaintiff proved that the right shoulder condition for which he was subsequently treated and required surgery was either caused by or materially aggravated by the motor vehicle accident of May 3, 2005. Click v. Pilot Freight Carriers,Inc., 300 N.C. 164 (1980).
3. Plaintiff has not proven work related disability after June 6, 2006 when he was released to return to work. As of June 6, 2006 plaintiff was capable or returning to his pre-injury job had he not quit. Plaintiff has not established that he made a reasonable effort to find suitable employment or that it would be futile to seek employment. Russell v.Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff is entitled to compensation for twenty-eight and 2/7th weeks for the temporary total disability he sustained during the period he *Page 9 
was out of work due to his surgery from November 21, 2005 through June 6, 2006 as a result of this injury by accident. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $293.33 for twenty-eight and 2/7ths weeks for his temporary total disability. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded to plaintiff herein is hereby approved for plaintiff's counsel, which fee shall be deducted from the award and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of November 2008.
 S/___________________
 BERNADINE S. BALLANCE
 COMMISSIONER
 CONCURRING: *Page 10 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1